# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF ARKANSAS

**UNITED STATES OF AMERICA**                                 **PLAINTIFF**

**vs.**                     **No. 4:19:CR00564-09 BSM**

**SHERRY STANSBERRY**                                         **DEFENDANT**

## MOTION TO RECONSIDER RELEASE ON CONDITIONS

The Defendant, Sherry Stansberry, by and through his attorney, Erin Cassinelli, states in support of her Motion to Reconsider Release on Conditions:

1. On October 2, 2019, the Grand Jury for the U.S. District Court for the Eastern District of Arkansas returned an indictment charging Ms. Stansberry with conspiracy to distribute fentanyl and the use of a telephone in furtherance of that conspiracy. Ms. Stansberry entered pleas of not guilty and was released on conditions to include inpatient drug treatment.

2. After being medically treated with opiate pain medications many years ago, Ms. Stansberry developed an addiction to opiates. Although dependent on opiates, she was a "functioning addict," including working full time at a job she held for many years and concealing her addiction from her family. Her addiction is longstanding and runs deep; it has been difficult for her to maintain sobriety after an over 20-year dependency, and, as is typical of those overcoming addiction, she has relapsed on several occasions. Yet, Ms. Stansberry remains determined to overcome her addiction and has the unwavering support of her family in her efforts to do so.

3. Ms. Stansberry completed inpatient treatment on November 22, 2019, and moved to chem-free living. By December 4, 2019, she relapsed. Shortly after, she became ill while at home and did not return to the chem-free living center one night, resulting in her termination from the program. Thereafter, she testified positive for opiates on several occasions. On one occasion,

she required medical attention. As a result of several of these circumstances, the government moved to revoke her release, and the Court held a hearing on the motion.

4. At the hearing, the Court ordered Ms. Stansberry detained but permitted her to request that the Court reconsider release after 60 days. Ms. Stansberry has been incarcerated for more than 60 days.

5. She has not seen her children since the Court detained her over two months ago. Ms. Stansberry's elderly parents are unable to travel long distances, so if Ms. Stansberry is assigned to a facility outside of central Arkansas, she will likely not be able to see her family. Due to the distance, the risk of disease, and her parents' ages and health issues, they cannot visit her in the jail facility where she is currently detained.

6. On March 11, 2020, citing her history and that she did "poorly without supervision and structure," the Court denied Ms. Stansberry's request for release to her home and participation in UAMS's outpatient buprenorphine program.

I. **REQUEST FOR RECONSIDERATION OF RELEASE ON CONDITIONS THAT ARE SUFFICIENT TO ENSURE THE SAFETY OF MS. STANSBERRY AND THE COMMUNITY.**

7. Ms. Stansberry asks the Court to reconsider releasing her. She is willing to accept any treatment the Court will permit, including inpatient treatment if the Court feels it appropriate. Although counsel is uncertain about admissions to inpatient treatment units given the quarantine recommendations, Ms. Stansberry is agreeable if that is the Court's preference and it is possible under the circumstances. Ms. Stansberry, however, in consultation with counsel, her family, and several professionals experienced in recovery issues, asks the Court to consider an outside program that lasts longer and includes more intense treatment than the traditional inpatient programs may be most appropriate for her. Locally, that is offered at Natural State Recovery in Little Rock.

8. Natural State Recovery ("NSR") offers a partial hospitalization program that includes 25 hours a week of therapeutic treatment (9am to 3pm each weekday) at the center.[1] It includes random drug testing and the possibility of medication-assisted treatment. NSR has its own medical staff including a physician who determines the best individualized treatment plan for each patient. This may include the use of medication-assisted treatment, such as buprenorphine or naltrexone, if the physician determines it is the most appropriate course of treatment.

9. Ms. Stansberry would attend that program and reside in NSR's recovery housing, which is considered an alternative to traditional inpatient settings.[2] It is very structured and disciplined, according to NSR's CEO. It includes a two bedroom "apartment" with all needs met (food, utilities, etc.), and 24/7 access by a trained and credentialed specialist living on site. Living in the recovery housing requires additional 12 step meetings daily, mandatory house meetings, and other activities. Ms. Stansberry would be ordered to remain at the facility at all times other than when attending pre-approved activities with NSR staff.

10. Ms. Stansberry has no objection to electronic monitoring if the Court feels it is appropriate.

11. Once Ms. Stansberry completes phase one (at least 90 days, more if determined to be necessary) at NSR, she would move to a chemical-free living facility off-site and would

---

[1] As long as she is committed to following the program, a grant will cover the cost of clinical treatment (medications, doctor's visit, therapies, etc.), and Ms. Stansberry's family will pay for the recovery housing.

[2] The 90-day program combines three recovery supports, which are clinical treatment, recovery housing, and life skills training. The clinical treatment model includes a partial day treatment program and an intensive outpatient program (IOP). In addition, clients receive mental health services and individual counseling sessions for a greater positive impact on future success. See https://www.naturalstaterecovery.com/our-program for more detailed information.

continue with phase two of NSR's program, intensive outpatient treatment. At that time, depending on whether Ms. Stansberry has been prescribed medication in connection with her treatment, she will request that the Court and USPO consider permitting her to live at non-contract chemical-free living facility, such as Next Step, a women-only facility. [3] Because her specific needs are not yet clear, it is premature to request approval to a particular facility, but Ms. Stansberry is committed to continuing the NSR program (if approved by the Court) and thereafter living in a supportive, sober community as long as is necessary. Ms. Stansberry could also do any additional outpatient treatment recommended by her pretrial services officer.

12. Ms. Stansberry understands the Court's concerns about her history of noncompliance, the depth of her addiction, and the need for supervision and structure. Given the current circumstances, she is uncertain of what is available, but she assures the Court she is ready and willing follow whatever conditions the Court feels are appropriate to support her efforts to overcome her addiction. She asks the Court to consider the option she has presented herein and to formulate an order that the Court feels is best suited to ensure she is not a danger to herself or others.

13. AUSA Julie Peters has authorized undersigned counsel to state that the United States defers to the Court and Pretrial Services regarding Ms. Stansberry's release to the proposed NSR program with the conditions outlined above.

II. **ALTERNATIVE REQUEST FOR CONSIDERATION OF RELEASE PURSUANT TO § 3142(i) OR THE COURT'S INHERENT AUTHORITY.**

---

[3] Next Step is a recovery group, with required meetings, peer to peer support, and drug testing. It does not offer treatment/clinical services. https://nextstepwomen.com/. It has an excellent reputation in the recovery community and works well in connection with the long term NSR three-phase program, absent medication-assisted treatment (which is not permitted at Next Step). The team will continue to review options for sober living placement in the event that medication-assisted treatment is utilized in Ms. Stansberry's case.

14. Additionally, the Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The circumstances that existed when Ms. Stansberry was ordered detained have now changed. There is a pandemic that poses a direct risk to Ms. Stansberry that is far greater if she continues to be detained during this public health crisis. The threat of COVID-19 under the circumstances presented herein is a sufficiently "compelling reason" for release.

15. As the Court is well aware, nearly all of the country is practicing social distancing due to the threat of a pandemic. The President has declared a National Emergency, and public health officials have advised that one of the most effective ways to avoid spreading the disease is to limit exposure, particularly to persons at higher risk of developing serious COVID-19 illness, and to constantly wash hands and clean food and surfaces. It is recommended that people not gather in groups of ten or more, and that if possible, people quarantine themselves, avoiding all people outside of immediate family.

16. According to the CDC, those at increased risk include older adults (with risk increasing by age) and people who have serious chronic medical conditions such as heart disease, diabetes, and lung disease.[4] People in these categories should avoid crowds, avoid close contact with third parties, and avoid touching public surfaces, among other preventative measures. Ms. Stansberry has suffered with asthma for over a decade and was diagnosed with COPD several

---

[4] The CDC has issued guidance that individuals at higher risk of contracting COVID-19—adults over 60 years old and people with chronic medical conditions such as lung disease, heart disease, and diabetes—take immediate preventative actions, including avoiding crowded areas and staying home as much as possible. *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020) *at* https://bit.ly/2vgUt1P.

years ago. People with COPD and asthma, like Ms. Stansberry, are at particular risk for COVID-19 with worse outcomes.  Experts anticipate that many people at risk to will not have access to adequate medical treatment because hospitals will fill up quickly with infected people and will run out of room and personnel.

17. Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[5] Inmates cycle in and out of jail facilities from all over the state, and people who work in the facilities leave and return daily, without screening.  Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in pretrial detention centers.[6]  Many people who are incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to severe forms of COVID-19. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[7]  Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[8]  In China, officials have confirmed the coronavirus spread at a rapid pace

---

[5] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

[6] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

[7] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[8] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

in Chinese prisons.[9] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[10] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[11] Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners.[12]

18.  Due to her health conditions, Ms. Stansberry is at increased risk for severe symptoms of the disease, COVID-19, that is quickly spreading around this state, the country, and the world.[13] In a jail setting, she is at increased risk of contracting the disease, as she cannot follow any of the recommended protocols to keep herself healthy. She is constantly exposed to other people, including those coming in from the outside regularly (like guards and new inmates), and it is impossible to keep surfaces clean from the hundreds of inmates that touch them each day.

---

[9] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) *at* https://bit.ly/2vSzSRT.

[10] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020) *at* https://cnn.it/2W4OpV7.

[11] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020) *at* https://apnews.com/af98b0a38aaabedbcb059092db356697.

[12] Sarah Lustbader, *Coronavirus: Sentenced to COVID-19*, The Daily Appeal (Mar. 12, 2020) *at* https://theappeal.org/sentenced-to-covid-19/.

[13] *See, e.g.*, "Update: Protecting Yourself During the Spread of Coronavirus Disease (COVID-19)," American Lung Association (March 18, 2020) *at* https://www.lung.org/about-us/media/top-stories/update-covid-19.html; CDC, "If You Are At Higher Risk" at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html.

Should she contract COVID-19 from contact with someone who has been exposed, her condition would quickly become dire, requiring medical care that may not be available – likely will not be available – at that time and certainly not in a jail setting. More so than other inmates, Ms. Stansberry's life and health are at risk from this pandemic.

19. As of this week, there do not appear to be any particular protocols in place for Arkansas jails to prevent the spread of COVID-19 or to contain such if/when it does reach the jails. There are insufficient – basically no - policies regarding the enhanced screening of new inmates to check for the disease or how to contain and/or quarantine those affected. The county jails are woefully unprepared for what appears to be an imminent threat.[14] There are at least five confirmed cases of coronavirus in the small county in which Ms. Stansberry is being held.[15] Ms. Stansberry's

---

[14] *See* https://slate.com/news-and-politics/2020/03/coronavirus-civil-rights-jails-and-prisons.html. For example, counsel made two FOIA requests to the Pulaski County Sheriff's Office (PCSO) seeking the county jail's policies regarding prevention and response to a possible outbreak of COVID-19 and/or any infectious disease. Other than a memo sent out to all PCSO personnel on March 13th, 2020 advising staff to call in sick if they are exhibiting any symptoms and four handouts regarding the importance of handwashing and appropriate facemask usage, the returns made clear that the jail has no policies or procedures in place to prevent the spread of COVID-19, or to contain such if/when it does reach the jail. Specifically, there are no policies regarding any enhanced screening of new inmates to check for the disease or how to contain and/or quarantine those affected.

[15] The local jail housing Ms. Stansberry has candidly acknowledged the risks the jail staff and inmates face during this difficult time:

> Given the close proximity of inmates and staff to each other in this lockup, it is going to be very difficult to prevent the spread of coronavirus once it is introduced into the facility as the virus can spread vis the microscopic vapor that we release every time we speak, cough or sneeze.
> The staff Grant County Jail - Sheridan Detention Center will do everything we can to stop the spread within our facility, however we have to be honest, we are all entering uncharted territory under what is already normally a very difficult and stressful situation for the inmates and their families.

https://www.jailexchange.com/city-and-county-jails/arkansas/grant-county/grant-county-jail-sheridan-detention-center/covid-19-coronavirus-visitation-policy

children and other family are fearful for her health and safety as well as fearful for their own health.[16]

20. The health risk to Ms. Stansberry, because of her medical conditions, and given the conditions at the local jail facilities in Arkansas, necessitates her temporary release until the pandemic has ended. At the very least, Ms. Stansberry asks the Court to release her temporarily, whether to a treatment program or to the care of her parents with significant conditions including location monitoring, frequent drug testing, and home incarceration.

21. To wait until the national emergency is "over" is to postpone Ms. Stansberry's release and treatment for her addiction indefinitely. We have no way to predict when this pandemic will be under control, and there is no end in sight. To continue to detain her due to this unknown is not only unfair and counterproductive to the rehabilitation aspects and options provided by the Bail Reform Act, but it is effectively mandating future detention, despite the Court's previous indication of a willingness to reconsider treatment, for a reason that is out of Ms. Stansberry's control. It is true that her violations, obviously due to her significant and longstanding addiction, brought her before the Court and caused her detention in the first instance, but prospectively holding her because of the coronavirus (despite it posing a health and safety risk far exceeding that which existed at the time the Court detained her or otherwise normally associated with custody) leaves her without any ability to persuade the Court and leaves the Court without any ability to exercise its discretion to determine whether there are conditions that are sufficient but not greater than necessary to fulfill the purposes of the Bail Reform Act, including rehabilitation. Ms.

---

[16] Additionally, at the state level, all efforts are being made by state courts, prosecutors, and defense counsel to release pretrial inmates without violent charges or histories. Thus, Ms. Stansberry will be detained with a statistically higher population of violent inmates than is typical. This puts her safety at further risk.

Stansberry has not been found to be, and is not, a danger to others or a risk of flight; the concern is the risk she may pose to herself caused by her addiction, and now that Ms. Stansberry has been in custody for months, the plan presented adequately addresses that risk and furthers her rehabilitation. If the Court's directives cannot be or are not met, there is nothing that would prevent the Court from ordering Ms. Stansberry back into custody or modifying its order based on the circumstances at that time.

22.     AUSA Julie Peters has authorized undersigned counsel to state that based on the information currently available to the United States, the United States opposes release pursuant to § 3142(i) on the basis of health concerns due to the coronavirus. If the Court denies release on conditions outlined in the first section herein, the United States requests a hearing at which the parties may present evidence and argument on the issue of release pursuant to § 3142(i).

23.     If necessary and possible, Ms. Stansberry asks the Court to schedule a (video) hearing at which the Court and parties can discuss these options and the Court can determine if there are appropriate conditions under which to release Ms. Stansberry, taking into account all available options and the health risks presented herein.

WHEREFORE, the Defendant, Sherry Stansberry, asks the Court to grant her motion, and for any other relief the Court finds appropriate.

Respectfully submitted,

/s/ **Erin Cassinelli**
ABN 2005118
erin@lcarklaw.com

**Attorney for Defendant**
LASSITER & CASSINELLI
813 West Third Street
Little Rock, AR 72201
(501) 370-9300